UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIERRA CLUB, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>REGINA MCCARTHY, in her official capacity as Administrator of the United States Environmental Protection Agency,<br><br>Defendant. | Case No. 13-cv-03953-SI<br><br>**ORDER GRANTING JOINT MOTION TO APPROVE AND ENTER CONSENT DECREE AND DENYING OTHER MOTIONS AS MOOT**<br><br>Re: Dkt. Nos. 120, 149 |

Now before the Court is the parties' joint motion to approve and enter a proposed consent decree, as well as objections thereto. For the reasons set forth in this order, the Court GRANTS the joint motion and OVERRULES the objections. The Court DENIES all other pending motions as moot.

**SUMMARY**

Plaintiffs Sierra Club and the Natural Resources Defense Council and defendant Regina McCarthy, Administrator of the Environmental Protection Agency ("EPA"), have jointly moved the Court to approve and enter a proposed consent decree. The proposed consent decree would fully resolve plaintiffs' claims under the Clean Air Act, 42 U.S.C. §§ 7401-7671q, against defendant based on EPA's failure to promulgate designations for the 2010 revised primary sulfur dioxide ("SO$_2$") national ambient air quality standard. The proposed consent decree sets forth mandatory deadlines for EPA to issue designations for all areas of the country that remain undesignated.

The Court finds that the proposed consent decree is procedurally and substantively fair and

1   reasonable.  A number of states have objected to the proposed consent decree, arguing that where
2   the EPA has failed to promulgate air quality designations by the statutory deadline, the Clean Air
3   Act requires that the EPA issue "unclassifiable" designations for undesignated areas.  As set forth
4   in this order, the Court finds that these objections lack merit, and that the Clean Air Act does not
5   compel "unclassifiable" designations.  In a "deadline suit" such as this, the appropriate remedy is
6   to set a binding schedule for the EPA to make all remaining designations, while preserving EPA's
7   discretion to determine, based on available information, whether an area is in "attainment" or
8   "nonattainment" with the revised sulfur dioxide air quality standard, or whether the area is
9   "unclassifiable."

10   The States also object that the proposed consent decree improperly incorporates the EPA's
11   proposed Data Requirements Rule for the 1-Hour Sulfur Dioxide ($SO_2$) Primary National Ambient
12   Air Quality Standard (NAAQS), 79 Fed. Reg. 27,446 (May 13, 2014).  The proposed Data
13   Requirements Rule, if adopted, would require state air agencies to provide to EPA data to
14   characterize current air quality in areas with large sources of $SO_2$ emissions using either additional
15   air quality monitoring or modeling.  The Court finds that the proposed consent decree is
16   independent of the proposed Data Requirements Rule, and that the deadlines contained in the
17   proposed consent decree are not dependent on the Rule's promulgation.

18   The Court also finds that the proposed consent decree is procedurally fair.  A notice of the
19   proposed consent decree was published in the Federal Register on June 2, 2014, and the record
20   reflects that 133 public comments were submitted and considered.  Prior to the public comment
21   process, there were extensive, arms-length negotiations between the parties, with the participation
22   of the intervening states, regarding a possible remedy in this case.  The intervening states have had
23   the opportunity to file objections to the proposed consent decree, and the Court has also permitted
24   the filing of several *amicus* briefs.  The Court has carefully considered all of these filings, and the
25   record in this case, in reaching the conclusion that the proposed consent decree meets the
26   standards for court approval.

27
28

# BACKGROUND

## I. Statutory background

Pursuant to Title I of the Clean Air Act, the EPA is required to set national ambient air quality standards ("NAAQS") for certain air pollutants. 42 U.S.C. § 7409. A NAAQS sets the maximum permissible concentration of the pollutant in the ambient air. *Id*. Primary NAAQS are set at levels "requisite to protect the public health," with a sufficient margin of safety. *Id.* § 7409(b)(1). Secondary NAAQS are set at levels "requisite to protect public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air." *Id*. § 7409(b)(2).

Within one year after the EPA establishes or revises a NAAQS, each state is required to submit to the EPA a list identifying the state's initial recommended designations for all areas within the state. *Id*. § 7407(d)(1)(A). Pursuant to the Clean Air Act, states may make three types of designations: (1) "attainment" for areas that comply with the NAAQS, (2) "nonattainment" for areas which do not meet the NAAQS, and (3) "unclassifiable" for "any area that cannot be classified on the basis of available information as meeting or not meeting" the NAAQS. *Id*. EPA is required to promulgate designations in response to the states' recommendations within two years after EPA promulgates or revises a NAAQS. *Id*. § 7407(d)(1)(B). EPA can extend this deadline "up to one year in the event the Administrator has insufficient information to promulgate the designations." *Id*. § 7407(d)(1)(B)(i). In promulgating designations, EPA may make any modifications "the Administrator deems necessary" to a state's recommended designations. *Id*. § 7407(d)(1)(B)(ii). If EPA modifies a state's designation, the agency must provide the state with a minimum of 120 days notice and an opportunity to show why the agency's proposed modification is incorrect before EPA issues final designations. *Id*.

Air quality designations determine what type of federally-required implementation plan is appropriate for each area and what permitting standards apply. *See, e.g*., 42 U.S.C. § 7410 (general implementation planning requirements), § 7475 (permitting requirements for "attainment" and "unclassifiable" areas), § 7503 (permitting requirements for "nonattainment" areas). If an area is undesignated, or designated "attainment" or "unclassifiable," the state is required to

1  develop a "state implementation plan" that provides for implementation, maintenance and
2  enforcement of the new or revised NAAQS. *Id*. § 7410(a)(1)-(2). If an area is designated
3  "nonattainment," there are additional planning requirements and stricter new source review
4  permitting requirements. *Id*. §§ 7502-7503, 7514-7514a(b)(1).

5  On June 2, 2010, EPA revised the primary sulfur dioxide ($SO_2$) air quality standard to
6  establish a new 1-hour $SO_2$ NAAQS at a level of 75 parts per billion. "Primary National Ambient
7  Air Quality Standard for Sulfur Dioxide; Final Rule," 75 Fed. Reg. 35,520, 35,525/1-27/3 (June
8  22, 2010); 40 C.F.R. § 50.17(a)-(b). In the preamble to that rule, EPA noted that implementation
9  of the NAAQS is complicated because of the "unique source specific impacts of $SO_2$ emissions,"
10 the complexity of defining the appropriate methods for determining area designations, and the
11 "potential for substantial $SO_2$ emissions reductions as a result of national and regional rules" that
12 were then underway. *Id*. at 35,550/2-3. EPA also explained that the $SO_2$ monitoring network is
13 limited, and that after considering public comments EPA "intend[ed] to use a hybrid analytic
14 approach that would combine the use of monitoring and modeling to assess compliance with the
15 new 1-hour $SO_2$ NAAQS." *Id*. at 35,551. Over the next several years, EPA continued to analyze
16 different approaches to implementing the revised NAAQS. *See generally* Dkt. 95 at 7:16-11:11
17 (discussing process); Dkt. 97-3 ("Next Steps for Area Designations and Implementation of the
18 Sulfur Dioxide National Ambient Air Quality Standard") (February 6, 2013).

19 Pursuant to Section 107(d)(1)(A) of the Clean Air Act, 42 U.S.C. § 7404(d)(1)(A), the
20 states' recommended designations regarding the revised $SO_2$ NAAQS were due on June 2, 2011.
21 The intervening states submitted their designations by the June 2, 2011 deadline.[1] EPA granted
22 itself the permitted one-year extension, under which it was required to publish air quality
23 designations by June 2, 2013. In granting itself the extension of time to promulgate designations,
24 EPA noted the uncertainty as to what "analytic approach sources, states, and EPA will consistently
25 and cooperatively use" to make the designations. 77 Fed. Reg. 46,295, 46,297/2-3 (Aug. 3, 2012)

---

[1] According to the EPA, "states have been reporting updated monitoring data to EPA since their recommended designations were submitted in 2011, which in some cases was necessary in order to obtain a full three-calendar years of monitored data that did not yet exist 'as of' June 2013." Dkt. 104 at 10:16-19.

4

("Extension of Deadline for Promulgating Designations for the 2010 Primary Sulfur Dioxide National Ambient Air Quality Standard").

In August 2013, the EPA promulgated "nonattainment" designations for 29 areas in 16 states where three full calendar years of air quality monitoring data showed violations of the standard. "Air Quality Designations for the 2010 Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard," 78 Fed. Reg. 47,191 (Aug. 5, 2013) ("2013 Designations Rule"). For the remaining undesignated areas of the country, the preamble of the 2013 Designations Rule stated:

> In separate future actions, the EPA intends to address the designations for all other areas for which the agency is not yet prepared to issue designations and that are consequently not addressed in this final rule. With input from a diverse group of stakeholders, EPA has developed a comprehensive implementation strategy for the future $SO_2$ designations actions that focuses resources on identifying and addressing unhealthy levels of $SO_2$ in areas where people are most likely to be exposed to violations of the standard.

78 Fed. Reg. at 47,193/3. In response to the 2013 Designations Rule, some commenters criticized EPA for its "deferral" of designations. *See* EPA, Responses to Significant Comments on the State and Tribal Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS), at 7 (July 2013), EPA-HQ-OAR-2012-0233-0354 (excerpts available at Dkt. 91-5 and Dkt. 154-2). In a section of the EPA's responses titled "Not Yet Taking Action on Areas With No Monitored Violation," EPA stated that it is "not at this time reaching any final conclusions about areas that do not have violating monitors" and that "[o]bjections to EPA's not yet addressing other areas are outside the scope of this final action." *Id*. at 5, 7. EPA also stated that it "is not yet taking any final action regarding other areas," and that "[i]t is therefore not necessary for EPA to respond to the points raised by these comments regarding other areas that are not addressed in this initial action." *Id*. at 5.

In a separate but related regulatory action, in May 2014 EPA published a proposed Data Requirements Rule which, if promulgated, would direct state air agencies to characterize air quality in those locations defined in the rule as priority areas using the state agency's choice of either additional air quality monitoring or modeling, and to submit such data to EPA to support further designations. *See* Data Requirements Rule for the 1-Hour Sulfur Dioxide ($SO_2$) Primary

5

1  National Ambient Air Quality Standard (NAAQS), 79 Fed. Reg. 27,446 (May 13, 2014).  A final
2  Data Requirements Rule has not yet been promulgated.

## II. This litigation and proposed consent decree

On August 26, 2013, plaintiffs Sierra Club and the Natural Resources Defense Council filed this complaint under the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(a)(2), seeking to compel defendant to perform her non-discretionary duty under the Clean Air Act to promulgate and publish designations identifying all areas of the nation that meet or fail to meet the revised $SO_2$ NAAQS, as well as all areas of the nation where information is inadequate to make a designation.  On October 3, 2013, Sierra Club also filed a protective petition for review of the 2013 Designations Rule.  *See Sierra Club v. EPA*, D.C. Cir. Case No. 13-1262, Doc. #1515525 (Environmental Petitioners' Motion to Deconsolidate Case No. 13-1262 and Hold It in Abeyance). Dkt. 154, Ex. A   at 5-6 (Sierra Club Motion to Deconsolidate Petition, describing protective filing). In the petition for review, Sierra Club stated the issue presented as "whether EPA acted illegally and arbitrarily by failing to include sulfur dioxide designations for all areas of the country in the final action at issue here." *Id*. at 6.  That petition has been stayed.  Dkt. 161 at 10:3-9.

In this action, plaintiffs moved for summary judgment on liability, which defendant did not dispute.  In an order filed December 6, 2013, the Court found as a matter of law that defendant "is in violation of her non-discretionary duty under the Clean Air Act, 42 U.S.C. § 7407(d)(1)(B), (d)(2)(A) to promulgate and publish designations for all areas of each state for the standard no later than three years from promulgation of the standard." Dkt. 79 at 3:18-20.  In the same order, the Court granted two motions for permissive intervention filed by the Commonwealth of Kentucky Energy and Environment Cabinet, the State of Louisiana Department of Environmental Quality, and the states of North Carolina, North Dakota, Arizona, Nevada and Texas (collectively "the States").  On January 15, 2014, North Carolina filed a complaint in intervention to "compel the Administrator of the U.S. Environmental Protection Agency ('Administrator' or 'EPA'), to take action mandated by the Clean Air Act, 42 U.S.C. § 7401 *et seq*. ('CAA') to designate areas within North Carolina as nonattainment or attainment/unclassifiable for the revised National

1  Ambient Air Quality Standard ('NAAQS') for sulfur dioxide ($SO_2$)." Intervenor Compl. ¶ 1, Dkt.
2  83. As with plaintiffs' complaint in this case, North Carolina's complaint was filed pursuant to
3  the Clean Air Act's citizen suit provision, 42 U.S.C. § 7604(a). The other intervenor states did not
4  file a complaint in intervention.

5        The Court directed the parties and intervenor states to meet and confer regarding a possible
6  remedy. The parties and the States engaged in settlement discussions, including at least ten group
7  settlement conference calls and exchanges of settlement proposals. Dkt. 121-1 ¶¶ 6-8. EPA also
8  had separate settlement discussions with certain of the states and with the plaintiffs. *Id*. ¶¶ 10-11.
9  The general approach adopted in the proposed consent decree, which requires EPA to complete
10 designations in three phases, was proposed and discussed in the group settlement negotiations. *Id*.
11 ¶ 8. After the parties reached an impasse in their negotiations, they filed extensive briefing on
12 competing proposals for a remedy. During the briefing process, EPA and plaintiffs reached a
13 tentative settlement agreement, and on May 19, 2014, EPA and plaintiffs lodged the proposed
14 consent decree with the Court. The Court then granted EPA's motion to stay these proceedings
15 until August 1, 2014, pending the public comment process regarding the proposed consent decree.
16 A notice of the proposed consent decree was published in the Federal Register on June 2, 2014,
17 seeking comment on the proposed decree. 79 Fed. Reg. at 31,325. One hundred and thirty three
18 public comments were filed, including many by the intervenor states and *amici* in this case.

19       On August 8, 2014, the parties filed a joint motion to approve and enter the proposed
20 consent decree. Dkt. 124. North Carolina filed a brief opposing approval, and a separate
21 opposition brief was filed collectively by the Commonwealth of Kentucky, Energy and
22 Environment Cabinet, the Louisiana Department of Environmental Quality, and the states of
23 Arizona, Nevada, North Dakota, and Texas. Dkt. 127. The Court also permitted *amicus* filings by
24 the states of Nebraska, Alabama, Alaska, Arkansas, Georgia, Indiana, Kansas, Louisiana, Ohio,
25 Oklahoma, South Carolina, South Dakota, West Virginia, and Wyoming, as well as the National
26 Environmental Development Association's Clean Air Project ("NEDA/CAP") and the Texas $SO_2$
27 Working Group. Dkt. 135, 148.

28       The proposed consent decree would require EPA to issue all remaining designations

according to a three-phase schedule that applies nationwide. Proposed Consent Decree at ¶¶ 1-3, Dkt. 120-2. First, within 16 months of the entry of the consent decree, EPA would sign for publication designations for those areas that, based on air quality monitoring in the preceding three full calendar years, have monitored violations of the revised $SO_2$ standard. *Id*. ¶ 1(a). By the same date, EPA would issue designations for areas that "contain any stationary source that has not been 'announced for retirement' . . . and that, according to the data in EPA's Air Markets Database, either (1) emitted more than 16,000 tons of $SO_2$ in 2012, or (2) emitted more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 lbs $SO_2$/Mmbtu or higher in 2012." *Id*. ¶ 1(b)-(c). EPA states that "the areas that fall within paragraph 1(b) contain the largest sources of $SO_2$ emissions in the country and may have $SO_2$ levels that cause areas to exceed the standard." Dkt. 121 at 8:1-2.

Second, by December 31, 2017, EPA would sign for publication designations "for remaining undesignated areas in which, by January 1, 2017, states have not installed and begun operating a new $SO_2$ monitoring network meeting EPA specifications referenced in EPA's anticipated rulemaking [the Data Requirements Rule] directing states to collect and analyze additional information regarding $SO_2$ emissions concentrations." *Id*. ¶ 2. In the final round, by December 31, 2020, EPA would sign for publication designations for all remaining undesignated areas. *Id*. ¶ 3. The proposed decree provides that it does not "limit or modify the discretion accorded EPA by the CAA and by general principles of administrative law, including the discretion to alter, amend or revise any response and/or final action contemplated by [the proposed consent decree]." *Id*. ¶ 7. The proposed consent decree would establish binding deadlines even if the Data Requirements Rule is not adopted. However, if the Data Requirements Rule is adopted, the data collection process proposed in the rule could be used to support EPA's designations under the consent decree.

## LEGAL STANDARD

Approval of a proposed consent decree is within the discretion of the Court. *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990). A court reviews a consent decree to determine

whether it is "fundamentally fair, adequate and reasonable." *Id*. The Court must evaluate both the procedural and substantive fairness of the consent decree. *United States v. Chevron*, 380 F. Supp. 2d 1104, 1110-11 (N.D. Cal. 2004). In addition, while a consent decree "must conform to applicable laws . . . [it] need not impose all the obligations authorized by law." *United States v. Oregon*, 913 F.3d at 580.

The Court's review of the proposed consent decree is informed by the public policy favoring settlement. *See United States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 280 (1st Cir. 2000). "This deference is particularly strong where the decree has been negotiated by the Department of Justice on behalf of an agency like the EPA which is an expert in its field." *Chevron*, 380 F. Supp. 3d at 1111. However, when reviewing a proposed consent decree, the Court must independently evaluate its terms and avoid giving a "rubber stamp approval." *United States v. Montrose Chem. Corp. of Cal*., 50 F.3d 741, 747 (9th Cir. 1995) (quoting *City of Detroit v. Grinnell Corp*., 495 F.2d 448, 462 (2d Cir. 1974)).

In applying the "fair, adequate and reasonable" standard, courts examine both procedural and substantive fairness. *See United States v. Cannons Engineering Corp*., 899 F.2d 79, 86 (1st Cir.1990). With regard to procedural fairness, courts determine whether the negotiation process was "fair and full of adversarial vigor." *United States v. Telluride Co*., 849 F. Supp. 1400, 1402 (D. Colo. 1994) (citations and internal quotations omitted). If the decree was the product of "good faith, arms-length negotiations," it is "presumptively valid and the objecting party has a heavy burden of demonstrating the decree is unreasonable." *United States v. Oregon*, 913 F.2d at 581. However, "the district court must ensure that the agreement is not . . . a product of collusion . . ."). *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir.1991)

With respect to substantive fairness, it is not the duty of the court to determine whether "the settlement is one which the court itself might have fashioned, or considers ideal." *Cannons*, 899 F.2d at 84; *see also BP Exploration*, 167 F. Supp. 2d at 1050 (stating that court should refrain from "substitut[ing] its judgment for that of the parties"). Instead, the "court's approval is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Oregon*, 913 F.2d at 581 (internal quotations omitted). "The court need only be satisfied that the decree

represents a reasonable factual and legal determination." *Id*. (internal quotation omitted).

## DISCUSSION

### I. Jurisdiction

Plaintiffs filed this action pursuant to the Clean Air Act's citizen suit provision, 42 U.S.C. § 7604(a)(2). That provision authorizes "any person" to commence a civil action in district court "against the Administrator where there is an alleged failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." *Id*. The parties and the intervenor states assert that this Court has jurisdiction over this lawsuit pursuant to the citizen suit provision because plaintiffs seek to compel the Administrator to perform her non-discretionary duty to issue designations for the remaining areas in the country.

On September 12, 2014, non-parties Texas $SO_2$ Working Group and NEDA/CAP sought leave, which the Court granted, to file an amicus brief arguing that this Court lacks jurisdiction over this action. *Amici* contend that the EPA's 2013 Designations Rule includes EPA's "decision to defer" the remaining area designations for the revised $SO_2$ NAAQS, and that this decision is a final agency action that may only be challenged in the Court of Appeals for the District of Columbia Circuit pursuant to the Clean Air Act's judicial review provision, 42 U.S.C. § 7607(b). That provision states, *inter alia*, that challenges to any "nationally applicable regulations promulgated, or final action taken, by the Administrator under [the Clean Air Act] may be filed only in the United States Court of Appeals for the District of Columbia." *Id*. § 7607(b)(1). In addition, "[w]here a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to [7607(b)(1)]." *Id*. § 7607(b)(2). Under the Clean Air Act, jurisdiction for review of final agency actions and jurisdiction to compel nondiscretionary agency action are mutually exclusive. *Envtl. Def. Fund v. Costle*, 448 F. Supp. 89, 92-93 (D.D.C. 1978).

The Clean Air Act provides for jurisdiction in the circuit courts of appeal only for "'final" agency actions. *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 193 (D.C. Cir. 2011). In order to be a "final agency action," the action must meet two conditions. *Bennett v. Spear*, 520 U.S. 154,

177-78 (1997). First, the action must "mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id*. Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id*. at 178 (citations omitted). *Amici* argue that this case is similar to *Maine v. Thomas*, 874 F.2d 883 (1st Cir. 1989), in which the First Circuit held that an EPA rulemaking stating that the agency would engage in further agency action to promulgate regulations amounted to a "final action taken," and thus that the district court lacked jurisdiction over a citizen suit to compel EPA to issue the regulations. *Id*. at 891. At issue was EPA's decision to defer promulgating regional haze regulations pursuant to § 169 of the Clean Air Act, 42 U.S.C. § 7491. *Id*. at 885-86. The EPA stated in the preamble to the regional haze rulemaking that:

> Future phases will extend the visibility program by addressing more complex problems such as regional haze and urban plumes. We will propose and promulgate future phases when improvement in monitoring techniques provides more data on source-specific levels of visibility impairment, regional scale models become refined, and our scientific knowledge about the relationships between emitted air pollutants and visibility impairment improves.

45 Fed. Reg. 80,084, 80,086 (Dec. 2, 1980). The First Circuit held that the rulemaking, referred to as "Phase 1," was a final agency action because,

> EPA announced Phase 1 as a regulatory scheme, fully explained and defended in the text setting out the regulations. Furthermore, the administrative proceedings had directly addressed the possibility that regional haze rules and orders might be delayed. To mince no words, the decision to defer constituted a fully developed part of the final action taken on the statutory mandate. . . . [T]he final action taken has legal effect and establishes procedural requirements, such as substantive conditions and consequent deadlines, for establishing future phases.

*Maine*, 874 F.2d at 887-88.

The parties respond that EPA's 2013 Designations Rule is a final agency action only with respect to the 29 areas that were designated in that rule. The parties contend that the statement in the preamble that "[i]n separate future actions, the EPA intends to address the designations for all other areas for which the agency is not yet prepared to issue designations and that are consequently not addressed in this final rule," 78 Fed. Reg. at 47,193/3, does not reflect the culmination of any decisionmaking process with respect to the undesignated areas, and simply

11

1   recognized that the 2013 Designations Rule did not include designations for all areas of the
2   country and that EPA's designations process would continue. 78 Fed. Reg. 47,197-205 (setting
3   forth the revisions to 40 C.F.R. Part 81, Subpart C). The parties argue that, unlike *Maine v.*
4   *Thomas*, where "the decision to defer constituted a fully developed part of the final action taken on
5   the statutory mandate," here the 2013 Designations Rule did not contain any analysis of the states'
6   recommendations regarding the undesignated areas, nor did EPA address the available information
7   concerning emissions levels in those areas. The parties argue that the 2013 Designations Rule did
8   not include any proposals regarding intended future designations for areas outside the scope of the
9   2013 Designations Rule, nor did it contain a schedule for future action.

10   The parties contend that this case is more similar to *Portland Cement Association v. EPA*,
11   665 F.3d 177 (D.C. Cir. 2011) (*per curiam*). In *Portland Cement*, environmental groups filed a
12   petition for review in the D.C. Circuit challenging EPA's failure to regulate greenhouse gasses
13   from cement facilities as part of a rule establishing emissions standards for such facilities under
14   the Clean Air Act. *Id*. at 182. In the preamble to the challenged rule, EPA stated that it did "not
15   yet have adequate information about greenhouse gas emissions to set a standard," and that it was
16   "working towards a proposal for greenhouse gas standards," which it would issue after obtaining
17   additional information. *Id*. at 184. The D.C. Circuit held that these "explicitly tentative and
18   conditional statements—which expressed certainty only as to EPA's decision to continue the
19   process of studying greenhouse gases" could not "possibly be considered 'final.'" *Id*. at 193.

20   The Court concludes that the preamble statement in the 2013 Designations Rule is not a
21   final agency action, and thus that this Court has jurisdiction over this case. As an initial matter,
22   the Court notes that "[w]hile preamble statements may in some unique cases constitute binding,
23   final agency action susceptible to judicial review, this is not the norm." *Natural Res. Def. Council*
24   *v. EPA*, 559 F.3d 561, 564-65 (D.C. Cir. 2009) (internal citation omitted); *see also American*
25   *Petroleum Institute v. E.P.A.*, 684 F.3d 1342, 1354 (D.C. Cir. 2012) (holding preamble statement
26   that permit applicants "will initially be required" to meet certain standards "could reasonably be
27   read to mean the EPA intends in the future to establish such a requirement, in which case the
28   statement falls short of being the consummation of the agency's decisionmaking process.").

Here, the preamble statement does not represent the consummation of any agency decisionmaking or alter the status quo. Unlike in *Maine*, where "the decision to defer constituted a fully developed part of the final action taken on the statutory mandate," the administrative record for the 2013 Designations Rule does not contain any analysis for the undesignated areas, nor does it contain an analysis of the decision to defer promulgating designations. *See generally* 78 Fed. Reg. 47,191; Docket ID No. EPA-HQ-OAR-2012-0233 at www.regulations.gov. The administrative record shows that in responding to public comments submitted in connection with EPA's notice of proposed designations, EPA repeatedly stated that it was "not yet taking any final action regarding other areas [aside from the 29 areas designated as "nonattainment"] . . . and EPA has neither proposed action for those areas nor taken final action for them in this round of designations." Dkt. 154-2 at 5 (Responses to Significant Comments on the State and Tribal Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS), at 7 (July 2013), EPA-HQ-OAR-2012-0233-0354). Like the "explicitly tentative and conditional statements" in *Portland Cement* "which expressed certainty only as to EPA's decision to continue the process of studying greenhouse gases," EPA's statement in the preamble to the 2013 rule was simply an indication that EPA was "not yet prepared to address" the undesignated areas, and that EPA will "continue to work" with stakeholders to obtain the data to assist in preparing those designations. 78 Fed. Reg. at 47,191/3, 47,193/3-94/1. Both the language of the preamble statement and the context of the entire 2013 Designations Rule demonstrate that the preamble statement is of an interlocutory nature, and not a "consummation of the agency's decisionmaking process." *American Petroleum Institute*, 684 F.3d at 1354 ("By acknowledging it had not yet, but 'w[ould] need to[,] ... carefully evaluate[ ]' the effect of the new NAAQS on the permitting process, the EPA made clear it was not making a final decision."); *cf. Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 14 (D.C. Cir. 2005) ("An agency's past characterization of its own action, while not decisive, is entitled to respect in a finality analysis.").

## II. Approval of the consent decree

The intervenor and *amici* states raise a number of objections to the proposed consent

13

1 decree, and they contend that the proposed consent decree lacks substantive and procedural
2 fairness. For the reasons set forth below, the Court concludes that the proposed consent decree is
3 fair and reasonable, both procedurally and substantively, and consistent with the Clean Air Act
4 and other applicable law.

5 The central dispute between the parties and the intervenor and *amici* states is whether
6 EPA's failure to promulgate area designations by the statutory deadline requires EPA to
7 promulgate "unclassifiable" designations for all undesignated areas, or whether EPA may, as set
8 forth in the proposed consent decree, have additional time to complete the designation process and
9 issue "attainment," "nonattainment," or "unclassifiable" designations based upon the data before
10 the agency. The States argue the proposed consent decree violates Section 107(d)(1)(B), which
11 provides,

> Upon promulgation or revision of a national ambient air quality standard, the Administrator shall promulgate the designations of all areas . . . as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised national ambient air quality standard. Such period may be extended for up to one year in the event the Administrator has insufficient information to promulgate the designations.

16 42 U.S.C. § 7407(b)(ii). The States argue that the statute allows EPA no more than three years
17 from the date it finalizes a new NAAQS to complete the area designation process, and that the
18 proposed consent decree improperly allows EPA additional time to complete that process. The
19 States argue that "EPA does not have to designate the remaining areas 'unclassifiable' because it
20 missed the deadline. EPA must designate the areas 'unclassifiable' because it lacks the data it
21 needs to make any other designation." Dkt. 135 at 6:13-16.

22 North Carolina cites *Sierra Club v. E.P.A.*, 762 F.3d 971 (9th Cir. 2014), for the
23 proposition that when EPA misses a deadline, the "same standards apply both before and after the
24 deadline and EPA does not 'possess[] the power' now that it has missed the deadline, 'to resolve
25 the matter as it sees fit.'" Dkt. 124 at 8:7-9 (quoting *Sierra Club*, 762 F.3d at 981). In *Sierra
26 Club*, Avenal Power Center applied to the EPA for a permit to build and operate a power plant.
27 Although the Clean Air Act imposed a duty on EPA to either grant or deny the permit application
28 within one year, EPA failed to do so. After the deadline passed but before EPA took final action

14

on the permit application, EPA promulgated more stringent air quality standards. Avenal sued EPA, seeking to compel EPA to issue the permit under the old standards that would have applied if EPA had issued the permit by the statutory deadline. After initially stating that the Clean Air Act required EPA to apply the regulations in effect at the time of the permitting decision, EPA changed course and granted the permit under the old standards, asserting that it had "grandfathering authority." The Sierra Club brought suit challenging EPA's action, and the Ninth Circuit held "[t]he plain language of the statute . . . clearly requires EPA to apply the regulations in effect at the time of the permitting decision." *Id*. at 979. The sections of the Clean Air Act interpreted in *Sierra Club* are different from those at issue in this case. However, relevant here, in rejecting the EPA's contention that it had the authority to issue the permit under the old standards, the Ninth Circuit stated,

> Nothing in the statute precludes EPA from enforcing current NAAQS and BACT requirements even if it unreasonably delays taking action on a Permit. Moreover, the Clean Air Act is not silent about the consequences of such delay. "Congress *has* directly spoken to [that] precise issue"—namely, by providing a private right of action to compel timely action. *Chevron* [*U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 842 (1984)]. Under 42 U.S.C. § 7604(a)(2):
>
>> Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf . . . against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.
>
> Avenal Power, of course, availed itself of this remedy and brought suit in the D.C. district court. That court, correctly in our view, did not find the appropriate remedy to be issuance of the Permit without regard to the newly-promulgated regulations. Instead, it simply ordered the agency to come to a final decision. *See Avenal Power Ctr., LLC v. EPA*, 787 F.Supp.2d 1, 4–5 (D.D.C. 2011).

*Id*. at 980-81 (internal footnote omitted). The Ninth Circuit also noted,

> We find *Brock v. Pierce Cnty*., 476 U.S. 253, 256, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986), instructive in this regard. In *Brock*, a since-repealed provision of the Comprehensive Employment and Training Act required the Secretary of Labor to issue a final determination as to the misuse of certain funds within 120 days after receipt of a complaint alleging misuse. *Id*. Although the statute used mandatory language requiring the Secretary to investigate and issue formal findings, it did not specify consequences for the Secretary's failure

15

> to act. *Id*. at 258–59, 106 S.Ct. 1834. The Court rejected the argument that the 120–day period was a statute of limitations that barred the Secretary from taking further action on the complaint after the 120–day period expired, reasoning: "We would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake." *Id*. at 260, 106 S.Ct. 1834. And the Court then concluded, instead: "When, as here, there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act." *Id*. (footnote omitted). The appropriate relief, the Court noted, was an order compelling the agency to act. *Id*. at 260 n. 7, 106 S.Ct. 1834.

*Id*. at 981 n.5. Thus, rather than supporting the States' position, *Sierra Club* holds that the appropriate relief in a deadline suit is to compel the agency to act, rather than ordering a particular substantive outcome. *See also Kennecott Copper Corp. Nev. Mines Div., McGill Nev. v. Costle*, 572 F.2d 1349, 1354 (9th Cir. 1978) (holding EPA had non-discretionary duty to make a decision about state's revision of its CAA state implementation plan, but that EPA "retains a good deal of discretion as to the content of that decision"); *Frey v. EPA*, 751 F.3d 461, 469 (7th Cir. 2014) ("Our review of the EPA's actions is limited. . . . to allow review only of whether the EPA followed required decision-making procedures. . . . The substance of the EPA's decisions, on the other hand, is at least partly discretionary, and therefore beyond the scope of these citizen suit provisions.").

North Carolina also asserts that the proposed consent decree would allow EPA to avoid having to make "unclassifiable" designations. However, the proposed consent decree preserves EPA's discretion to make designations of "nonattainment," "attainment," or "unclassifiable" based upon the information before the EPA, and nothing in the proposed consent decree precludes EPA from ultimately issuing "unclassifiable" designations.

The States of Nebraska *et al*., cite an EPA brief in *Mississippi Commission on Environmental Quality v. EPA*, Case. No. 12-1309 (and consolidated cases), 2013 WL 6529643 (filed Mar. 20, 2014), and *Catawba County, N.C. v. EPA*, 571 F.3d 20, 26 (D.C. Cir. 2009), to argue that the Clean Air Act "requires an unclassifiable designation when the available information does not permit a finding of attainment or nonattainment." Dkt. 135 at 6:20-7:2. At issue in those cases was whether specific air-quality designations were flawed or not supported by

1   data. Neither case stands for the proposition that the EPA must issue "unclassifiable" designations
2   in circumstances where, as is the situation here, EPA has repeatedly explained that there was
3   uncertainty as to how to best characterize $SO_2$ emissions for purposes of implementing the revised
4   $SO_2$ standard, and EPA was working with the states, tribes, and other entities to address that issue
5   before reviewing the information before the EPA. Contrary to the states' arguments, the EPA has
6   not stated that it lacks sufficient information to issue designations for the remaining areas, but
7   rather that because of the uncertainty regarding how to best characterize emissions, it was "not yet
8   prepared to issue designations." 78 Fed. Reg. 47,191.

9   Here, although Section 107(d)(1)(B) uses mandatory language requiring EPA to
10  promulgate air-quality designations no later than two years from the date of promulgation of the
11  new or revised national ambient air quality standard, the Clean Air Act does not specify what
12  happens in the event that EPA misses a designation deadline. The Court finds it significant that
13  Congress did not prescribe a default consequence for violation of the deadline, as it did in other
14  places in the Clean Air Act. *See* 42 U.S.C. §§ 7407(d)(1)(C) (discussing designations of
15  nonattainment by operation of law for particular areas); § 7410(k)(1)(B) (stating that if EPA fails
16  to make a determination that a state implementation plan fails to meet minimum criteria by the
17  statutory deadline, the plan is deemed by operation of law to meet such criteria);
18  § 7545(o)(2)(A)(i), (iv) (requiring that EPA promulgate renewable fuel regulations by August 8,
19  2006, but providing that "[i]f the Administrator does not promulgate regulations under clause (i),
20  the percentage of renewable fuel in gasoline . . . shall be 2.78 percent for calendar year 2006").
21  Under *Sierra Club* and *Brock*, the appropriate remedy in a "deadline" case such as this is to
22  require EPA to issue designations pursuant to a schedule, not to mandate that EPA issue any
23  particular designation.

24  The States also contend that the proposed consent decree does far more than set a binding
25  and enforceable schedule for EPA to complete remaining designations, and that it establishes
26  duties and obligations beyond EPA's authority. The States assert that paragraph 1(b) of the
27  proposed consent decree intrudes on EPA's discretion in making designations, such that
28  "designations can be based on the mere presence of very specific and large emitting sources of

17

$SO_2$ in a certain area." Dkt. 127 at 11:25-12:6.  However, paragraph 1(b) does not affect EPA's discretion to determine the particular designation for an area, and instead only provides that certain areas containing large sources of $SO_2$ pollution are required to be designated by EPA within 16 months of entry of the decree.

The States also assert that the proposed consent decree "discard[s]" the "work that the Intervenor States completed to make their initial designations" or "may" render the work "stale." Dkt. 124 at 18-19; Dkt. 127 at 15:3-5.  However, the States do not cite any language in the proposed consent decree that renders invalid or obsolete the earlier information provided by the States.  The parties state that the initial recommendations and accompanying information submitted by the states remain in the administrative record for consideration by EPA.  *See* Dkt. 132 at 6:4-6.  Further, in making designations pursuant to the decree, EPA must comply with the statutory procedure for promulgating designations based on state recommendations, which includes notifying states of any intended modifications to their recommendations no later than 120 days before the date of promulgation and allowing them an opportunity to demonstrate why any designation is inappropriate.  *See* 42 U.S.C. § 7404(d)(1)B)(ii).

The intervenor States also argue that the proposed consent decree improperly deprives them of their claims. However, to the extent that the States are concerned about the effect of this litigation on other pending cases, the parties state that "[a]ny decision by this Court to enter the proposed consent decree would not, in and of itself, result in the dismissal of the Plaintiff-Intervenors' claims in those suits. That is, if the Court enters the proposed consent decree here, those parties will still be free to pursue earlier deadlines in those actions (with respect to remaining undesignated areas within their states)." Dkt. 132 at 12:16-20.  With respect to the intervenors' claims in this case, only North Carolina has filed a complaint in intervention, and that complaint requests that the Court "[i]ssue a mandatory injunction requiring the Administrator to perform her mandatory duties by a certain date set by the Court." Dkt. 83 at 6.  Thus, rather than depriving North Carolina of its claims, the proposed consent decree provides North Carolina with the relief sought, namely a binding schedule to issue all remaining designations.

The remainder of the States' substantive objections relate to the proposed Data

18

1    Requirements Rule. The States assert that paragraphs 2 and 3 of the proposed consent decree
2    "dictate the mechanism that States must use in collecting new data for EPA." Dkt. 127 at 11:15-
3    17.  However, those paragraphs only set a deadline for issuing designations for those areas in
4    which, by January 1, 2017, states have not installed and begun operating a new $SO_2$ monitoring
5    network, and a later deadline for all remaining undesignated areas. Similarly, although the States
6    may need to supplement and update their previous submissions if the Data Requirements Rule is
7    adopted, that would be a consequence of the Data Requirements Rule, not the proposed consent
8    decree.  The States also complain that the proposed consent decree "violates the Administrative
9    Procedure Act ('APA') and undermines the [Data Requirements Rule] rule-making process." Dkt.
10   135 at 8:15-16. However, the States do not explain how the proposed consent decree violates the
11   APA, 5 U.S.C. § 553, which applies to agency "rule making," and does not apply to promulgation
12   of air quality designations. *See* 5 U.S.C. § 551(4-)(5)(defining "rule making" and "rule"); 42
13   U.S.C. § 7407(d)(2)(B) ("Promulgation or announcement of a designation under paragraph (1) . . .
14   Shall not be subject to the provisions of sections 553 through 557 of Title 5 (relating to notice and
15   comment)."). The Court also finds that the proposed consent decree does not undermine the
16   separate Data Requirements Rule process, as the proposed consent decree is independent of the
17   Data Requirements Rule process. The proposed consent decree was subject to public comment,
18   and the Data Requirements Rule has been subject to its own separate public rule-making process.

19   Finally, the States assert that the proposed consent decree was procedurally unfair because
20   a number of the *amici* states did not participate in settlement negotiations, and the EPA and
21   plaintiffs had settlement negotiations that did not involve the intervenor States. North Carolina
22   also asserts that the settlement is collusive.

23   The Court finds that these objections lack merit. With regard to the *amici* states, with the
24   exception of the State of Louisiana (which is also an intervenor), it is undisputed that none of the
25   *amici* States sought to become parties to this action. The *amici* States do not cite any authority for
26   the proposition that they should have been invited to participate in settlement discussions in order
27   to assure procedural fairness. The Court also notes that the State of Louisiana, through the
28   Counsel for the Louisiana Department of Environmental Quality, participated in the discussions

19

held by the parties between mid-December 2013 and mid-May 2014. *See* Dkt. 121-1 at ¶¶ 4-8.

The record shows that the proposed consent decree is result of adversarial negotiations conducted over approximately six months, during which the seven state intervenors participated in at least ten settlement calls with the parties. Dkt. 121-1 ¶¶ 6-8. Although the intervenor states complain that EPA and plaintiffs had separate negotiations that resulted in the proposed consent decree, that fact does not mean that the proposed consent decree lacks procedural fairness. The intervenor states also had separate negotiations with EPA that did not include plaintiffs. *Id*. ¶¶ 10-11. Further, the approach taken in the proposed consent decree was discussed in the group settlement negotiations that included the intervenor states. *Id*. ¶ 8. Importantly, the proposed consent decree was subject to public comment, and both the *amici* and intervenor states participated in that process. 78, Fed. Reg. at 31,325; Dkt. 126-2. Finally, there is no support whatsoever for North Carolina's assertion that the proposed consent decree is "a collusive attempt" to secure an illegal remedy.

## CONCLUSION

For the reasons set forth above, the Court concludes that the proposed consent decree is fair and reasonable, both procedurally and substantively, and consistent with the Clean Air Act, and other applicable law. Accordingly, the Court GRANTS the parties' joint motion to approve and enter the proposed consent decree.

**IT IS SO ORDERED**.

Dated: March 2, 2015

_____
SUSAN ILLSTON
United States District Judge